# STATE OF MICHIGAN

# COURT OF APPEALS

JOEL DORFMAN and S. DENNIS ROGERS
TRUST,

        Plaintiffs/Counter -Defendants,

and

180 PIERCE STREET CONDOMINIUM
ASSOCIATION,

        Plaintiff/Counter-Defendant-
        Appellant,

v

PIERCE MARTIN LLC and TOWNHOUSE
KITCHEN AND BAR LLC,

        Defendants/Counter-
        Plaintiffs/Third-Party Plaintiffs-
        Appellees.

and

MARC SCAGLIONE and S. DENNIS ROGERS,

        Third-Party Defendants-Appellants,

and

LAITH HANNA, IVANNA HANNA, MELISSA
S. DORFMAN, SETH ROGERS, ANNA SACK,
SHAINA STARK and LESLIE ROGERS,

        Third-Party Defendants.

UNPUBLISHED
September 26, 2017

No. 333428
Oakland Circuit Court
LC No. 2011-118450-CH

Before: BECKERING, P.J., and MARKEY and RIORDAN, JJ.

PER CURIAM.

-1-

This appeal arises from a dispute between co-owners of a six-unit condominium project located at 180 Pierce Street in downtown Birmingham, Michigan. Four of the units are residential units and two are commercial units. The primary issue in this case is whether defendant Pierce Martin, LLC (hereafter "Pierce Martin"), which owned both of the commercial units, obtained the approval necessary to occupy and use part of the outdoor general common element space adjacent to one of its units for a commercial project it was developing. Appellants 180 Pierce Street Condominium Association (hereafter, "the Association"), Marc Scaglione, and Dennis Rogers appeal from the May 26, 2016 final order dismissing defendants' counterclaims and third-party claims. Appellants challenge two prior orders, one granting defendants' joint motion for a directed verdict, and the other granting defendants' joint motion for summary disposition pursuant to MCR 2.116(C)(10)(no genuine issue of material fact, and moving party entitled to judgment as a matter of law). We affirm.

## I. PERTINENT FACTS

The condominium building consists of two street-level commercial units of approximately 350 square feet each (Units 5 and 6), and four luxury residential units (Units 1 through 4), each occupying its own floor above the commercial units. Administration, operation, and maintenance of the building falls to the Association, which is a non-profit corporation comprised of all the condominium's co-owners with a Board of Directors ("the Board") that is granted broad authority by the condominium documents[1] to act on behalf of the Association. In July 2010, when events underlying this dispute began, Kousay (Casey) Askar owned Unit 1, but the unit was in foreclosure and an entity controlled by Enriko (Henry) Sasson had purchased the sheriff's deed. Dennis Rogers owned Unit 2, Laith Hanna owned Unit 3, and Marc Scaglione owned Unit 4. Pierce Martin owned Units 5 and 6. At all times relevant to this appeal, Scaglione was president of the Board, and Hanna was its vice-president.

According to evidence presented at trial, Jeremy Sasson, his brother, Jordan, and his father, Henry (collectively "the Sassons"), met with Rogers in July 2010, and Scaglione and Hanna in August 2010 to discuss their plans for the two commercial units. The Sassons proposed exterior improvements to the units that included the expansion of Unit 5 to enclose a portion of general common element[2] space that was at the time being used as a flowerbed. The

---

[1] Pursuant to Michigan's Condominium Act, MCL 559.101 *et seq.*, the administration of a condominium project is governed by the condominium bylaws. MCL 559.153. "Bylaws are attached to the master deed and, along with the other condominium documents, the bylaws dictate the rights and obligations of a co-owner in the condominium. See MCL 559.103(9) and (10); MCL 559.108." *Tuscany Grove Ass'n v Peraino*, 311 Mich App 389, 393; 875 NW2d 234 (2015). In the instant case, "condominium documents" refers to the master deed, as amended, and the bylaws.

[2] In addition to the residential and commercial units, the condominium project also consists of "common elements." The master deed classifies common elements as limited (e.g., an owner's balcony, an owner's designated parking spaces), or general (e.g., the perimeter land, the parking structure, the utilities used in common areas of the building). Each co-owner has an undivided

Sassons showed Rogers, Scaglione, and Hanna the same two sets of two sketches. Each set was comprised of a daytime and nighttime rendering; one set showed a red slanted awning covering the proposed expansion, and the other showed the same expansion with a black box-style awning. Rogers testified that the Sassons told him they were going to open a coffee shop, and he understood them to want to put up an awning under which their customers and the buildings' residents could sit.

On August 19, 2010, the Sassons met with Hanna and Scaglione and showed them the renderings. Scaglione testified that he thought the Sassons were asking him whether he liked the black awning or the red one, and that he did not believe the Sassons were asking him to consider the expansion of Unit 5 onto a common element. Scaglione recalled there being no discussion of the Sassons seeking formal or informal approval from the Association to exclusively use and occupy the common element area, and that they did not offer to compensate him or any of the Association co-owners for their ownership interest in the common elements. Scaglione acknowledged on cross-examination that his memory of the meeting was "hazy" or "foggy"; in fact, he said that he did not have an independent memory of the month in which the meeting took place, and testified, "I've come to learn that it was August, memorized the date . . . ." He also acknowledged that he had not retained in his files any of the early e-mails exchanged regarding the Sassons' proposal, stating that he had deleted them after receiving them and that it had not seemed important to him at the time to keep them. Scaglione further acknowledged that the meeting took place during "the depths of the great recession," at a time when vacancies in the neighborhood were up, real estate values were down by upwards of 50%, the two commercial spaces were empty, and Unit 5 was papered over.

The day after meeting with Hanna and Scaglione, Jeremy Sasson sent Rogers, Scaglione, and Hanna separate e-mails thanking them for the meeting and stating that he looked forward to working together "to accomplish this beautiful and dramatic building enhancement." Attached to each e-mail were the four renderings. Later that same day, Hanna sent Scaglione and Rogers a short e-mail message comprised in part of a list of nine items. Included on the list was the observation that they would be losing approximately 300 square feet of landscaping "owned by the association." Other items on the list included the need to provide a separate water meter for the retail spaces, what affect increasing the retail area would have on the common air conditioning usage, the need for an additional garbage pickup, landscaping, maintenance, snow removal, no service of alcohol unless approved by the Association, and the enterprises' hours of operation. Hanna testified that the items on the list were things that he and Scaglione had discussed, and that Hanna thought he, Scaglione, and Rogers needed to discuss in a conference call. Scaglione characterized the list as "how the association would interact with the restaurant if this were to happen, the coffee shop, what's become a restaurant now." Rogers said he "probably" received the e-mail and thought it represented conditions to defendants' use of Unit 5. Rogers said that, to his knowledge, the Association never agreed to allow the sale and consumption of alcohol on the common element, and there had been no resolution of the nine items. Scaglione also testified that the Sassons did not "agree to give any of the items on the

share in the general common elements determined by the percentage of value assigned to that co-owner's unit, and owns the general common elements as tenants in common with the other co-owners.

[August 20] list to the [A]ssociation in exchange for their approval." He conceded on cross-examination that the Sassons fulfilled seven of the nine items on the list.

After receiving Hanna's e-mail with the list, Rogers responded with his own email, stating," "LAITH [HANNA], I WILL GO ALONG WITH WHATEVER YOU AND MARC AGREE ON."[3] Rogers acknowledged at trial that, based on this e-mail, if Hanna and Scaglione had agreed to anything, he would be "stuck with it." He admitted that he took this position knowing that Hanna supported the project, and that it involved the loss of some landscaping and the potential sale of alcohol. He insisted, however, that Hanna and Scaglione did not reach an agreement with the Sassons on anything. Scaglione testified that he understood Rogers' e-mail to give him and Hanna the authority to negotiate a deal with the Sassons "regarding the awning and the outdoor seating." Hanna affirmed that when he received Rogers' e-mail, he interpreted it as indicating that Rogers "didn't have any problems. Whatever we decided, I decided. He gave me concession, go ahead." Hanna further testified that, in addition to receiving Rogers' e-mail, he ran into Rogers and his wife in the condominium's garage and Rogers confirmed his support of the proposed improvements.

Hanna testified that subsequent to his August 20, 2010 e-mail to Rogers and Scaglione, the three engaged in a 20- to 25-minute telephone conference call where they discussed the items on the list as well as noise, garbage, and an increase in the association fees paid by the commercial units. Neither Scaglione nor Rogers testified about this alleged conference call. Hanna said he did not recall much discussion about the list during the call, that Scaglione and Rogers were mainly concerned about lowering the Association's expenses, and that they discussed increasing the fee assessments for the commercial units. He said that alcohol was mentioned, but no one pushed, focusing instead on increasing the commercial units' association fees. According to Hanna, neither Scaglione nor Rogers objected to expansion of Unit 5. Hanna testified, "We verbally agreed about it right on the phone."[4]

---

[3] Shortly thereafter, Rogers replied to an earlier e-mail sent by Jordan Sasson asking if Rogers, Hanna, and Scaglione had had their conference call and, if so, how it went. Rogers responded:

> i just got a e-mail from laith [Hanna]. he wants to discuss. i told him I dont need to talk. i will agree to their position. if they say ok we are done. If they say no, my vote to approve is meaning.less [sic]. you need 48%. i have only 24%.

[4] Hanna said that when Rogers later asserted that he had not approved the expansion, Hanna "was upset with [Rogers] calling me, telling me that I never approved this when here I'm talking to the man, conference with him, seeing him in the garage, approving it. And I was just thinking, what are you talking about? After all these months you told me yes, yes, yes, yes, yes, and I have no problem. So it just made me feel so bad. Why he's saying totally something different of which you agreed with me."

On September 12, 2010, Hanna signed a document in his capacity as vice-president of the Association's Board that stated:

> 180 Pierce Street Condominium Association hereby approves the improvements to Units 5 and 6 of the 180 Pierce Street Condominium Project to be constructed by Pierce Martin LLC substantially in accordance with the sketch and floor plan attached hereto as Exhibit A.
>
> The Association has obtained all necessary approvals and consents of the Owners of the Units (and mortgagees if applicable) in the Condominium Project in accordance with the Master Deed dated July 15, 1999 and recorded on November 4, 1999 in Liber 20759, Page 480, Oakland County Records, as amended.

Attached as exhibit A were one of the renderings the Sassons had shown the co-owners and a schematic of the first floor showing the proposed expansion onto the common elements; Hanna initialed both attachments. Hanna said that Sasson provided him with color copies of all of the pages—the letter, the rendering, and the schematic—and he put copies in each owner's mailbox both before and after he signed the letter and initialed the rendering and schematic. He said that when he called Scaglione before he signed the letter, he didn't have any problem with it and that it was his understanding that Rogers didn't have a problem either. Hanna said he read the letter to Scaglione and "[h]e says okay with me." Hanna explained that when he signed the letter, he understood that defendants were going to improve Units 5 and 6 with a three-foot expansion and some canopies, and that the expansion was the one depicted on the attached rendering. Hanna testified that he signed the document because he understood that he had "a hundred percent approval from everyone." Although Scaglione testified that he did not "authorize" Hanna to sign the September 12, 2010 letter and recommended that he have a lawyer look at it, he did not testify that he told Hanna not to sign it because he did not approve its contents. He affirmed that at his deposition he testified that he could not recall the conversation and would not refute Hanna's account of it. Rogers was out of the county when Hanna signed the document.

Soon after obtaining the September 12, 2010 document, Pierce Martin applied to the City of Birmingham for a building permit. The City mailed notices of four public hearings held between October 6, 2010 and February 14, 2011 to all of the property owners and occupants located near the condominium address as well as to Rogers' Florida address.[5] The notice cards announced the subjects of the hearings as proposed exterior changes to the condominium building and review of the final site plan and special use permit "for 356 sq. ft. addition and outdoor seating."[6] According to their own testimony, neither Rogers,[7] nor Scaglione, nor Joel Dorfman, who had purchased Unit 1 in November 2010, attended any of the meetings.

---

[5] Apart from two weeks in October 2011, Rogers lived primarily in Florida and rented his unit to a grandson. In 2012, Rogers began using the unit regularly as a summer home.

[6] It is not clear whether the area actually measured 356 sq. ft., or whether the notice transposed the last two numbers. With the exception of Hanna's approximation of 300 sq. ft. in his August

In January 2011, Rogers learned from a newspaper article that Jeremy Sasson planned to open and operate a restaurant and bar in the two commercial units. Subsequently, Rogers asserted in a series of e-mail messages that he did not approve of and would not support Sasson's plan, and insinuated that Sasson had misled him regarding the nature of his project. On the day after the City of Birmingham approved Pierce Martin's site plan on February 14, 2011, Rogers sent Hanna an e-mail stating that the City's approval had "no bearing on our ownership" expressing certainty that the City could not proceed without the co-owners' approval and that the co-owners had not given their approval. Seeking to clarify the situation, Hanna responded with two e-mails indicating that all of the voting co-owners had consented to the outside expansion and seating for the bistro, and that the City had approved use of the space. In one email he stated specifically, "The expansion/addition was approved and signed by the Condominium Association on September 2nd [sic] after receiving consent from voting co-owners of the Association, which included you."

In April 2011, Dorfman and Rogers, through their attorney, demanded that Pierce Martin stop construction and restore the condominium to its former condition. When Pierce Martin did not respond, Dorfman and Rogers[8] filed the underlying complaint and an emergency motion seeking a temporary restraining order and a preliminary injunction.[9] They amended their complaint in September 2011 to add Townhouse Kitchen and Bar, LLC, as a defendant. The complaint alleged violations of Michigan's Condominium Act, MCL 559.101 *et seq*. (Count I), violations of the condominium's master deed and bylaws (Count II), and nuisance (Count III), and requested declaratory relief (Count IV). With respect to the latter, Dorfman and Rogers sought a ruling affirming their rights under the Condominium Act and the condominium documents, and stating that the co-owners had not approved defendants' construction activity on the common elements or their intent to open a restaurant and bar in the commercial units.

---

20, 2010 e-mail, the parties consistently refer to the common elements at issue as measuring 365 sq. ft.

[7] Notwithstanding evidence presented at trial that Rogers' Florida address was on the mailing list to receive notification of the public hearings, Rogers said that he did not receive any such notices. He also testified that he did not actively monitor developments while he was in Florida, but people would send him articles when they knew he was involved in a situation.

[8] Rogers later executed a warranty deed conveying his interest in Unit 2 to the Revocable Inter-Vivos Trust of Stephen D. Rogers, and in the spring of 2012 he successfully moved to substitute the trust as plaintiff in the action.

[9] In their emergency motion, Dorfman and Rogers argued that defendants had misrepresented to the city that they had all the necessary approvals when in fact they did not because the co-owners had never formally discussed and voted on the project, as required by the condominium documents. Dorfman and Rogers observed that not only had they not approved the project, they had "repeatedly – and vehemently – opposed it." Subsequent to a hearing on the matter, the trial court denied the motion without prejudice.

Defendants' occupation and use of the common elements at issue was a topic central to the Association's next two annual meetings. At the Association's 2011 annual meeting, Rogers proposed that the Association add a provision to the bylaws that would prohibit any owners, occupants, or "users" of Units 5 and 6 from selling, serving, or consuming alcohol "anywhere on the Condominium Premises." Rogers and Dorfman voted in favor of the proposal, Scaglione and Hanna voted against it, and Sasson abstained; consequently, the proposal failed. Not long after the 2011 meeting, Rogers filed a complaint in a separate cause of action against the Association.

During the Association's 2012 annual meeting, the Board unanimously approved and adopted four consent resolutions proposed by the Board president, Scaglione.[10] Of particular relevance is the second proposal, which purported to "immediately revoke[] any approval or permission claimed to have been given by the Corporation for the use of the General Common Elements South of the building (a formerly landscaped area) by the occupants of Units 5 & 6[.]" The proposal also demanded an immediate halt to "any commercial use, including but not limited to exclusive use and operation of a bar and restaurant[.]" In addition to this resolution, a motion was proposed to amend Article VI of the bylaws to prohibit the owners, tenants, occupants or other users of Unit 5 and 6 from selling, serving, or consuming alcohol "anywhere on the Condominium Common Elements South of Unit 5 (the formerly landscaped area)." This motion passed by a vote of four in favor and one (Sasson) opposed. The parties refer to this as the "second amendment."[11] Shortly after this meeting, the Association and Rogers entered into a consent judgment that resolved Rogers' suit against the Association. The Association then successfully moved to intervene in the instant case as a party plaintiff, adopting the allegations and requests for equitable relief that Dorfman and Rogers set forth in their first amended complaint, and adding a count for trespass and fraud/fraud in the inducement. Along with their answer and affirmative defenses, defendants filed a joint 15-count counterclaim and third-party complaint against Dorfman, Rogers, and several other individuals who were co-owners or related to co-owners of the condominium.

Over the next several months, the parties continued to engage in discovery and a vigorous motion practice. On April 4, 2013, plaintiffs moved to bifurcate the trial and for an immediate trial on the following issue:

> What *approval*, if any, were Defendants given to exclusively use and occupy 365 square feet of real property located south of Unit 5 and was that *approval* consistent with the Master Deed and Bylaws, as recorded in the Oakland County Records, as well as the Michigan Condominium Act.

---

[10] The record shows that at the 2012 annual meeting, in addition to returning Scaglione and Hanna to the Board as president and vice-president respectively, they elected Rogers as secretary-treasurer.

[11] The first amendment of the bylaws is irrelevant to the instant appeal.

The trial court granted the motion, and a six-day trial limited to the issue of "what approval, if any, was given for defendants' use of the three hundred and sixty-five square feet of common area" began on June 17, 2013.

In addition to the foregoing testimony about certain key documents, Scaglione testified at trial that he expected to receive compensation and protection from liability for the Association's approval of the awning and outdoor seating. He denied that he, Hanna, and the Sassons had agreed on anything that would have elicited his approval of the project, and stressed that the Sassons had not followed the procedures required to obtain the approval they sought. Scaglione stressed that he had never attended a meeting where he had voted to approve defendants' exclusive use and occupation of the common elements. He further stated that Henry Sasson has not asked the Association for "an amendment to the master deed granting Pierce Martin the right to use the common elements," and that even if one had been proposed, Scaglione would not have approved it because he "didn't want to give [his] property away for free." Rogers also denied that the Board or the co-owners approved defendants' exclusive use of the common elements. He stressed that he never gave approval for the Sassons to operate a restaurant and bar on the common elements, and repeatedly denied that the Board or the co-owners approved defendants' use of the space to operate a bar and restaurant.[12]

After the close of plaintiffs' case-in-chief, defendants moved for a directed verdict. Relevant to the instant appeal, they argued that the bylaws permit structural changes to the exterior of units with the Association's consent, and authorize the Board to act on behalf of the Association in this matter. They observed that, not only did the Board, i.e., Scaglione and Hanna, approve of the expansion, but with Rogers agreeing to follow the lead of these two, all the co-owners of the Association agreed to the expansion of Unit 5 onto the common elements. Dorfman and Rogers opposed the motion with essentially the same legal arguments that appellants advance on appeal. They contended that the Condominium Act prohibits the expansion of Unit 5 onto the common elements, that only the Association's co-owners could approve such expansion, and then only after following procedures that no one disputes were not followed in this case, and that defendants' use of the common elements violated certain other provisions of the condominium's governing statutes and documents. Dorfman and Rogers further contended that none of the co-owners approved defendants' operation of a restaurant and

---

[12] In addition to Scaglione, Rogers, and Hanna, the trial court also heard testimony from Dorfman, who acknowledged that, because he was not a co-owner in September 2010, he had no right to be consulted in connection with the September 12, 2010 document and was not involved with it in any way. Dorfman testified that a discussion of the matter with his real estate attorney convinced him that the condominium documents had to be amended if defendants were to exclusively occupy the common element at issue. Consequently, he emailed Rogers and Hanna in March 2011 suggesting that they obtain a legal opinion regarding whether the Association had agreed to defendants' use of the common element at issue. Rogers agreed with his suggestion, but Hanna and Scaglione did not. Dorfman recalled that he spoke with Jeremy Sasson and asked him not to proceed until he had the approval and support of all the residents, or he was setting himself up for protracted litigation, but Sasson did not take his advice.

bar on the common elements. Ruling from the bench, the trial court identified the key factual question as whether the Association consented to defendants' expansion of Unit 5 and use of the common element as a coffee shop or café. The trial court concluded that the evidence clearly showed that defendants obtained the necessary approval to "modify or alter unit five and to expand upon the common elements[,]" but left the legal effect of that approval to a later determination. The trial court entered a corresponding order, which it later amended twice for reasons without bearing on the instant appeal.

On January 10, 2014, defendants and the Association filed competing motions for summary disposition of Dorfman and Rogers' complaint and the Association's intervening complaint.[13] The Association reiterated the legal arguments it had made against defendants' motion for a directed verdict, and further asserted that it was unreasonable to rely on the September 12, 2010 letter because it was unsupported by written authorization from the co-owners and it violated the statute of frauds. Defendants asserted that in directing a verdict for them, the trial court had rejected the premise underlying all of plaintiffs' complaints, which was that defendants had not received the necessary approval to occupy and use the common elements at issue.

Subsequent to a hearing, the trial court issued a written opinion and order granting defendants' joint summary disposition motion pursuant to MCR 2.116(C)(10), and denying the Association's counter-motion for summary disposition; the trial court also denied without prejudice the Association's request to dismiss defendants' counterclaims. The trial court acknowledged that defendants did not obtain approval according to the procedures set forth in the bylaws, but noted that evidence submitted at trial established that the Association did not conduct formal business at the time. The trial court further observed that it was clear that "the majority of the co-owners in the condominium unit gave their express permission, or, at a minimum, acquiesced in the others' decisions." Moreover, the approval was in keeping with the Association's authority under the Condominium Act and the condominium documents to approve additions, alterations, and modification of the common elements. Finally, the trial court rejected the Association's characterization of the approval as tantamount to an illegal conveyance, ruling, "[t]he common area at issue is still common area, albeit modified for Defendants' use."

---

[13] The trial court's order granting defendants' a directed verdict also dismissed Dorfman from the case. Not only did Dorfman not own a unit at the time defendants sought and obtained approval to expand Unit 5, but the agreement under which he purchased the unit insulated him from fluctuations in the market price of the unit by giving him the option to require Askar to purchase the unit back at a fixed price. Therefore, Dorfman did not lose any rights in the common element at issue because he came to the unit after approval of defendants' expansion, and he would be unaffected by any decrease in his unit's value attributable to the operation of defendants' restaurant and bar because of the buy-back price agreement. Rogers did not join in the Association's motion or file a separate motion.

Subsequent to this order, litigation of defendants' counterclaims continued until, in a settlement agreement dated May 26, 2016, the parties stipulated to dismissal of those counterclaims and third-party complaints not previously dismissed, and the trial court entered a corresponding, final order. Of note, plaintiffs Dorfman and Rogers' trust are not the appellants in this Court. Rather, the Association and third-party defendants Scaglione and Rogers in his personal capacity filed the instant appeal.

## II. ANALYSIS

### A. JURISDICTIONAL CHALLENGE

Before turning to the merits of the appeal, we first address challenges to appellants' standing to bring this appeal. Defendants contend that the Association lacks standing to appeal because it did not follow its own bylaws and obtain an affirmative vote of a supermajority of its co-owners before commencing litigation. Defendants further contend that Scaglione and Rogers lack standing because they are not "aggrieved parties" for purposes of MCR 7.203(A). For the reasons stated below, we conclude that the Association has standing to appeal, but Scaglione and Rogers are not aggrieved parties.

As indicated elsewhere in this opinion, the administration of a condominium project is governed by the condominium bylaws. MCL 559.153. The bylaws of the 180 Pierce Street condominium require the Association's board of directors to obtain an affirmative vote of 75% of the co-owners in certain situations, including prior to hiring an attorney to evaluate a claim, to incurring the expense of further investigations of the claim, and to incurring "any expense or legal fees with respect to any litigation." Bylaws, Art XIII, § 6; Bylaws, Art II, § 2(c). Defendants argue that, because the Association did not obtain the prior approval of at least 75% of the co-owners, it lacked authority to file this claim of appeal. Defendants base their argument on their reasoning that an appeal is "new proceeding" because "[i]t requires new filings, new appearances, and new filing fees in a new court," and because the Association's attorney was under no obligation to file an appeal after dismissal in the trial court.

We are unpersuaded that a claim of appeal is a "new proceeding" of the type that required the Board in the instant case to adhere to the pre-litigation procedures set forth in the bylaws. This appeal is the continuation of a civil action begun by the filing of a complaint by Dorfman and Rogers in the trial court. MCR 2.101. Inherent in a civil action is the right to timely appeal the trial court's final order in this Court. MCR 7.203(A)(1); MCR 7.202(6)(a); MCR 7.204(A). The fact that an aggrieved party may decide not to appeal, and that an appeal in this Court requires new filings, appearances, and fees, and may involve a new attorney, does not make it a "new proceeding." Nothing in the bylaws indicates that procedures put in place to limit the board's authority to commence litigation were intended to restrict the board's ability to see the litigation through where completion called for a timely appeal.[14]

---

[14] Defendants' reliance on the holding in *Tuscany Grove Ass'n v Peraino*, 311 Mich App 389; 875 NW2d 234 (2015), is unavailing. The unauthorized lawsuit at issue in *Tuscany* was not an

-10-

We also reject defendants' contention that a claim of appeal is a "[m]odified undertaking[] involving material cost increases and ultimate commencement of formal proceedings for assertion of claims." Bylaws, Art XIII, § 6. Read in context, the phrase "modified undertakings" arguably refers to additional or modified evaluative or investigatory undertakings leading up to filing the initial claim. An appeal is not the "commencement of formal proceedings," but as already indicated, the continuation of proceedings initiated with the filing of a complaint. Therefore, because a claim of appeal is not a "new proceeding" or a "modification of the original matter" requiring adherence to the pre-litigation procedures set forth in the bylaws, defendants' argument that the Association lacks standing to bring this appeal necessarily fails.

Defendants next contend that Scaglione and Rogers lack standing because they were not individual plaintiffs below and are not "aggrieved parties" for purposes of MCR 7.203(A).[15] We agree.

This Court has jurisdiction of an appeal of right filed by an aggrieved party from a final judgment. MCR 7.203(A). "An aggrieved party is not one who is merely disappointed over a certain result. Rather, to have standing on appeal, a litigant must have suffered a concrete and particularized injury, as would a party plaintiff initially invoking the court's power." *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286, 291-292; 715 NW2d 846 (2006). There is a significant difference between a litigant with standing in the trial court and an aggrieved party for purposes of an appeal. "[A] litigant on appeal must demonstrate an injury arising from either the actions of the trial court or the appellate court judgment *rather than an injury arising from the underlying facts of the case*." *Id*., 475 Mich at 292 (Emphasis added). Thus, even a litigant who was not a party in the trial court proceedings may be an "aggrieved party" if the trial court's judgment injures the litigant in a way other than by an adverse decision on the underlying facts of the case.[16]

---

appeal from an already commenced lawsuit, and the defendant sought summary disposition of the plaintiff condominium association's complaint in the trial court, apparently before the parties engaged in substantial litigation.

[15] Appellants did not address this issue in their primary appellate brief, and they did not file a reply brief. However, in a brief in opposition to defendants' motion to dismiss filed with this Court, appellants relied on *Federated Ins Co v Oakland Co Rd Comm*, 475 Mich 286; 715 NW2d 846 (2006), to argue that Scaglione and Rogers did not have to be plaintiffs in the underlying suit to be aggrieved parties with the right to bring this appeal.

[16] See, e.g., *Martin v Secretary of State*, 482 Mich 956; 755 NW2d 153 (Mem) (2008) (holding that two non-party elected officials were aggrieved parties for the purposes of appellate standing where the circuit court's decision extending the filing deadline for the plaintiff in a suit against the Secretary of State meant they had to compete against someone potentially improperly placed on the ballot); *Mathew R Abel, PC v Grossman Investments Co*, 302 Mich App 232; 838 NW2d 204 (2013) (holding that an attorney who had an attorney-fee request partially denied was an aggrieved party with appellate standing).

Apart from *Federated Ins Co*, Scaglione and Rogers provide no argument or authority in support of their implication that they have standing to bring this claim of appeal simply because they were third-party defendants in Pierce Martin and Townhouse's counterclaim. Scaglione and Rogers were dismissed as third-party defendants, and thus, they cannot be aggrieved by the trial court's act of dismissing them from being sued. To the extent that they identify their "particularized harm" as arising from their status as individuals with rights or interests that the Association has the legal authority to pursue, they merely link their "aggrieved party" status to the Association's authority to pursue an appeal. Scaglione and Rogers rely on property rights derived from the Master Deed, and assert that they "are pursing remedies on appeal that they had when the litigation commenced and that they would have the right to recover, individually, if the appeal is successful." However, none of these assertions demonstrates an injury arising from the actions of the trial court. What they demonstrate is disappointment with the trial court's resolution of the underlying issues raised by the parties. Also telling is the fact that neither Scaglione nor Rogers raises any issues or arguments distinguishable from those of the Association, which suggests that, like the Association, they are disappointed and aggrieved by the trial court's decision on the underlying facts. Because Scaglione and Rogers fail to show an "injury arising from either the actions of the trial court or the appellate court judgment rather than an injury arising from the underlying facts of the case," *id.*, they are not aggrieved parties for purposes of MCR 7.203(A). But because the Association is an appellant with standing to appeal, we will address the issues it has raised, which are the same as those raised by Scaglione and Rogers.

## B. DIRECTED VERDICT

The Association first contends that the trial court erred in directing a verdict for defendants on the question of whether Pierce Martin received the requisite approval to occupy and use the common elements at issue because the evidence showed that no such approval was given. We disagree.

We review do novo a trial court's decision on a motion for a directed verdict. *Krohn v Home Owners Ins Co*, 490 Mich 145, 155; 802 NW2d 281 (2011). We review all of the evidence presented up to the time of the motion to determine whether a question of fact existed. *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 455; 750 NW2d 615 (2008), lv den 483 Mich 886 (2009). The Court reviews the evidence in the light most favorable to the nonmoving party, granting the nonmoving party every reasonable inference and resolving any conflicts in the evidence in the nonmoving party's favor. *Krohn*, 490 Mich at 155. "If reasonable jurors could honestly have reached different conclusions, this Court may not substitute its judgment for that of the jury." *Silberstein*, 278 Mich App at 455 (quotation marks and citation omitted).

Viewed in the light most favorable to appellants, reasonable jurors could not disagree that the Association, through both its Board and the voting condominium co-owners, approved defendants' proposal to build upon and use the common elements at issue. The September 12, 2010 letter states that the Association approves the proposed improvements and that it "obtained all necessary approvals and consents of the Owners of the Units (and mortgagees if applicable) in the Condominium Project in accordance with the Master Deed . . . ." The letter is signed by Hanna in his capacity as vice-president of the Association, and is accompanied by a floor plan

-12-

and sketch showing the expansion of Unit 5 onto the common elements. Hanna testified unequivocally that he signed the letter with the firm understanding that Scaglione and Rogers approved of the proposed improvements during a conference call held prior to September 12, 2010. He testified that he understood Rogers' August 20, 2010 e-mail to leave the decision to him and Scaglione, and that he confirmed Rogers' support for the proposal in a chance conversation with Rogers in the condominium's garage.

Scaglione's testimony does not directly refute Hanna's account. Scaglione believed at the time that the proposal would be an enhancement to the building. He acknowledged that the August meeting with the Sassons took place during "the depths of the great recession," at a time when neighborhood vacancies were up, real estate values were down, the two commercial spaces in the condominium had been foreclosed on, and Unit 5 was papered over. He affirmed that he told Hanna that they needed "to do something with the old retail space," and that it would be "the kiss of death" if they did not.

Further, nothing in the record indicates that Scaglione had any concerns about approving defendants' proposal. Although he stated that he and Hanna engaged in negotiations with the Sassons without reaching an agreement, he conceded that Pierce Martin accomplished seven of the items on Hanna's list from August 20, 2010. Scaglione's assertion that no agreement was reached seems more properly to characterize the period after late 2010 or early 2011, when the Association attempted without success to extract concessions, including a license agreement, from Pierce Martin. Plaintiffs present no evidence indicating that, prior to 2011, any of the co-owners desired compensation for defendants' use of 365 square feet of the common elements at issue beyond the items on Hanna's list and an increase in the Association fees paid by the commercial units. Likewise, they present no evidence indicating that liability protection was a concern of the co-owners prior to their discovery that Pierce Martin planned to open a restaurant and bar in the units.

Although Scaglione testified that he did not "authorize" Hanna to sign the September 12, 2010 letter and recommended that he have a lawyer look at it, he did not testify that he told Hanna not to sign it because he did not approve its contents. In fact, he affirmed that at his deposition he testified that he could not recall the conversation and would not refute Hanna's account of it. Further, Scaglione did not contradict Hanna's January 2011 emails informing Rogers that the Association had given its approval for the expansion, and he opposed Dorfman's suggestion to seek a legal opinion as to whether the Association had given approval. These facts could reasonably be inferred as indicating that he was aware that the September 12, 2010 letter permitted defendants' improvements and was supported by approval of the members of the Association.

In addition, evidence indicates that in August and September 2010, Scaglione did not view defendants' proposed improvements, which he knew included occupation and use of 365 square feet of common element, as the threat to his property interests that he later came to view them. Scaglione acknowledged on cross-examination that his memory of the meeting with the Sassons and their proposal for the building was "hazy" or "foggy," and that his attention was elsewhere at the time, and implied that he did not have an independent memory of the event. Asked if it were true that he was not paying close attention at the meeting, Scaglione responded, "Why should I have." He also acknowledged that he had not retained in his files any of the early

e-mails regarding the proposal. Whatever his later position, the evidence from August and September of 2010 suggests that Scaglione supported the Sassons' proposal to modify and occupy the condominium's commercial units.

Similarly, Rogers' testimony does not directly refute that of Hanna. He did not contest Hanna's testimony that Rogers agreed to defendants' expansion of Unit 5 onto and use of the common elements during a conference call with Hanna and Scaglione and during a chance encounter with Hanna in the condominium's garage. He admitted telling Scaglione and Hanna that he would follow their lead, knowing that Hanna supported the project and that it involved the loss of common elements space, and testified that he would be "stuck with" whatever they decided. After his August 30, 2010 e-mail to Hanna asking about progress with the Sassons and informing him that he was leaving the country for two weeks, nothing in the record indicates that Rogers questioned the proposed expansion onto the common elements until early 2011, when he learned that Jeremy Sasson was going to put in a restaurant and bar. However, the record shows that Dorfman, Rogers, and the Association agreed on the first day of trial that whether they required defendants to obtain separate approval to serve alcohol was not part of the issue presented to the jury in the trial. Nevertheless, Rogers consistently confused these two issues throughout the trial, stating that defendants never gave him any proposed plans for Townhouse Kitchen and Bar. He further asserted that he could not have approved of defendants' plan because Hanna and Scaglione never reached an agreement with the Sassons, and that, to his knowledge, the Sassons had fulfilled none of the items on Hanna's list from August 20, 2010.

Based on our review of the evidence, we conclude that if Hanna and Scaglione agreed to approve defendants' project, whether Rogers was aware that the Sassons had accomplished the items on Hanna's list was irrelevant. Rogers's testimony that he did not read the list carefully and that some of the items were Hanna's opinion suggests that he did not tie his proxy to completion of the items on the list. Further, even when he learned that Jeremy Sasson was planning a restaurant and bar for the space, Rogers appeared to object only to the particular commercial use of the space, not to defendants' expansion onto and use of the common elements. The record indicates that it was not until Dorfman became involved and this lawsuit was pending that Rogers informed Scaglione in an April 7, 2011 e-mail that neither he nor Hanna had "the legal right to give exclusive use to anyone of my share of a common area of our condo." In the same e-mail, Rogers withdrew permission for Hanna and Scaglione, i.e., the Board, to negotiate with the Sassons on his behalf, stating that he thought they had "failed in [their] responsibility to the state of Michigan and to the condo owners."

Viewed in the light most favorable to plaintiffs, the evidence does not reasonably support the conclusion that the Association did not approve defendants' proposed occupancy and use of the common elements adjacent to Unit 5 in the fall of 2010. Hanna was unwavering in his support of the project, and the evidence shows that, as much as Scaglione may have come to rue his support of the project, and Rogers his acquiescence to Hanna and Scaglione, both supported the structural improvements proposed by defendants in the summer of 2010. Events later transpired that may have caused them to regret communicating their approval without asking more questions or extracting more concessions, but this does not change the fact that the evidence shows that the approval conveyed by the September 12, 2010 letter represented the approval of the Board—Hanna and Scaglione—and the acquiescence of Rogers. Even if, for the sake of argument, one were to factor in Rogers' disapproval and Hanna's inability to contact

-14-

Askar, defendants' proposed use of the common elements still had the approval of the Board and four of six, or two-thirds, of the co-owners.[17] For these reasons, we affirm the trial court's grant of defendants' motion for a directed verdict on the question of whether Pierce Martin obtained the requisite approval to occupy and use the common elements at issue.

## C. SUMMARY DISPOSITION

The Association next argues that, even if Pierce Martin did obtain approval for its proposed occupation and use of the common elements, the approval was invalid because it violated various provisions of the Condominium Act, MCL 559.101 *et seq.*, and the condominium documents. Again, we disagree.

We review a trial court's decision on a motion for summary disposition de novo. *Auto Club Group Ins Co v. Burchell,* 249 Mich App 468, 479; 642 NW2d 406 (2002). Defendants brought their motion for summary disposition under MCR 2.116(C)(10). A motion for summary disposition under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Smith v Globe Life Ins Co*, 460 Mich 446, 454; 597 NW2d 28 (1999). "In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion." *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). If the documentary evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law, the trial court may grant the motion. *Id*. MCR 2.116(C)(10), (G)(4).

Characterization of the legal effect of the Association and co-owners' approval is critical to a determination of whether the approval violates Michigan's Condominium Act and the condominium documents. The Association contends that the approval constituted a conveyance to defendants of 365 square feet of formerly common element space. However, the trial court's summary disposition ruling rejects the notion that a conveyance has occurred. Even at trial, the trial court resisted characterizations of the approval as conveying the property or changing ownership, at one point reminding the litigants, "We're dealing with use, not conveyance, not ownership. The question is use." Accordingly, the trial court stated in its order granting defendants summary disposition, "[t]he common area at issue is still common area, albeit modified for Defendants' use." The trial court's conclusion reflects the nature of defendants' request and of the approval given in the September 12, 2010 letter. Defendants did not seek, the co-owners and the Association did not agree to, and the trial court did not find evidence of a change in the ownership of the common elements that would affect the material rights of the other co-owners. It is with this characterization of the legal effects of the Association's and co-owners' approval in mind that we turn to the merits of the Association's argument.

The Association first contends that any approval was void because it violated MCL 559.136, which authorizes a condominium master deed to "provide that undivided interests in

---

[17] Bylaws, Art X, § 1 provides that each co-owner gets one vote per unit owned, which means that Pierce Martin had two votes, and Hanna and Scaglione had one vote each.

land may be added to the condominium project as common elements" in which the co-owners share tenancy, but prohibits situating a condominium unit on the lands. We find this assertion unpersuasive.

The primary goal of judicial interpretation of statutes is to ascertain and give effect to the intent of the Legislature. *Mich Ed Ass'n v Secretary of State* (*On Rehearing*), 489 Mich 194, 217; 801 NW2d 35 (2011). The first criterion in determining intent is the specific language of the statute. *United States Fidelity Ins & Guaranty Co v Mich Catastrophic Claims Ass'n* (*On Rehearing*), 484 Mich 1, 13; 795 NW2d 101 (2009). The plain language of MCL 559.136 suggests that it authorizes a provision in a master deed describing how one could add land to the project, not necessarily restricting the use of land already a part of the condominium project. For example, there is a provision reserving to the developer of the project the right to add amenities as limited or general common elements, and to modify or delete units and common elements for six years from the recordation date of the master deed. Master deed, Art VII, § 2. However, there is no such analogous provision for the addition of land to the condominium in the master deed for 180 Pierce Street Association. Therefore, because the common elements at issue were part of the original condominium project rather than lands later added, MCL 559.136 does not operate in the instant case to render void the approval given to defendants to occupy and use a portion of the common elements adjacent to Unit 5.

The Association also contends that any approval given violates MCL 559.137(5), which generally renders void any alteration of "the undivided interest in the common elements allocated to any condominium unit" by "any purported transfer, encumbrance, or other disposition of that interest without the condominium unit to which it appertains." However, this argument fails because, as the trial court indicated in its summary disposition opinion and order, there was no alteration, transference, encumbrance, or other disposition of interests in the common elements. The common elements remain common elements, and the co-owners remain tenants in common, with defendants enjoying a right to occupy and use for their requested purposes that portion of the common elements at issue.

The Association next contends that the approval was void because neither the Board nor the Association's co-owners can change the restrictions in the condominium documents relative to use of the common elements. To the extent that the Association argues that constructing a restaurant and bar in the space at issue violates those provisions in the condominium documents prohibiting activities that are "immoral, improper, unlawful, or offensive" and that annoy or are a nuisance to the co-owners, Bylaws, Art VI, § 4, its argument goes beyond the narrow question presented in the bifurcated trial. The argument blends the question of whether defendants obtained approval to occupy and use the common elements with whether they obtained approval to use the expanded area in operation of a restaurant and bar. As indicated elsewhere in this opinion, the plaintiffs in the trial court action agreed that the latter issue was not part of the bifurcated trial.

Moreover, evidence at trial indicates that, at the time defendants' sought and obtained approval, they had not finalized their plans for the space. Although Rogers testified that the Sassons told him they were opening a coffee shop, he also admitted that he saw "many different versions" of defendants' plans, and the testimony of Scaglione and Hanna indicated that no final decisions had been reached. This is further support by Jeremy Sasson's admission in a January

2011 e-mail to Rogers that, "[w]hen we first met back in July [2010], I had no clue about what would be the final result of this retail project." Finally, in opposing defendants' motion for a directed verdict, counsel for Dorfman and Rogers argued that plaintiffs could not have approved of defendants' plan on September 12, 2010, because defendants' use of the space to operate a restaurant and bar was not clear until the City of Birmingham approved their plan on May 4, 2011. However, the question before the trial court was "what approval, if any, was given for defendants' use of the three hundred and sixty-five square feet of common area." Therefore, whether approval violated restrictions in the condominium documents that might be associated with a bar exceeds the scope of the issue tried.

The Association also argues that Pierce Martin violated the condominium documents by not obtaining the co-owners' approval "to enter into a lease with Townhouse." However, although the Bylaws authorize the Association to review a lease for compliance with the condominium documents, they do not authorize the Association to reject the lease. If the lease violates the condominium documents, Bylaws, Art VI, § 2 authorizes the Association to notify the leasing co-owner of the violations by certified mail and, if the leasing co-owner has not corrected the violations within 15 days, to pursue eviction of the lessee and damages. Nothing in the bylaws provides that, under such circumstances, the Association can simply declare the lease void.

The Association further argues that use of the space at issue is void because it violates the condominium documents' prohibition against obstructing common elements, including landscaped areas, and using them "for purposes other than that for which they are reasonably or obviously intended." However, Bylaws, Art VI, § 3 allows the Association to authorize exterior attachments and modifications to units and common elements. "Bylaws are generally construed in accordance with the rules used for statutory construction." *Slatterly v Madiol*, 257 Mich App 242, 255; 668 NW2d 154 (2003). A cardinal principle of statutory construction is to save and not to destroy. *Gora v City of Ferndale*, 456 Mich 704, 722; 576 NW2d 141 (1998). Thus, the usual rule of statutory construction is that apparently conflicting statutes should be construed, if possible, to be read harmoniously, *Nowell v Titan Ins Co*, 466 Mich 478, 482; 648 NW2d 157 (2002), and to give each full force and effect, *Ziegler v Witherspoon*, 331 Mich 337, 358; 49 NW2d 318 (1951). Applying this rule of statutory construction to interpretation of the bylaws at issue suggests that, while a co-owner may not decide unilaterally to use common elements in ways prohibited by the bylaws, the Association is empowered to allow modification and alterations in the common elements. In the instant case, the September 12, 2010 letter provided defendants with the "express written approval of the Association" to execute the modifications that all of the co-owners approved.

The Association next contends that the approval is void because neither the Board nor the co-owners strictly adhered to the procedures set forth in the condominium documents for making material changes to the rights of the co-owners. The Association contends that construction of a restaurant and bar on the common elements for defendants' exclusive and economic benefit constitutes a material change to the rights of the co-owners and mortgagees that requires approval of at least two-thirds of the co-owners and affected mortgagees, and amendment of the condominium documents. However, the trial court's conclusion that defendants received permission to *use* the common elements and that the area remains a common element, albeit modified for defendants' use, calls into question the Association's assumption that defendants'

use of the common elements constitutes a material change in its members' rights in the common elements. Further, although appellants allege that defendants assert exclusive use over the area, they present no evidence that defendants have excluded them from or restricted their use of the area. In other words, although appellants assert a diminishment of their rights, they have presented no evidence in support of this conclusion. Therefore, appellants have not provided the evidence necessary to create a genuine issue of material fact as to any alleged diminishment of their rights in the common elements that would require amendment of the master deed.

Finally, the Association contends that any approval given was void because it did not result from strict compliance with the procedural requirements set forth in the bylaws. There is no dispute that defendants' proposal was not noticed for discussion at an annual or special meeting and a vote taken on the proposal in accordance with the procedures set forth in the bylaws. However, the evidence shows that, to accommodate their particular schedules, the co-owners had previously adopted discussion through telephone conversations and e-mail as an alternate procedure for conducting the Association's business, and approved or acquiesced in the approval of defendants' use of the space in accordance with the alternate procedure they had adopted. The co-owners' approval was memorialized in the September 12, 2010 document, upon which defendants relied to obtain a building permit and begin construction on their project. Given these particular circumstances, to declare the approval void because it did not result from strict compliance with the bylaws would be to elevate formalities over substance.

The Association next contends that any approval purportedly given by the September 12, 2010 letter signed by Hanna was void because the letter did not satisfy Michigan's statute of frauds. Michigan's general real-estate statute of frauds provides:

> No estate or interest in lands, other than leases for a term not exceeding 1 year, nor any trust or power over or concerning lands, or in any manner relating thereto, shall hereafter be created, granted, assigned, surrendered or declared, unless by act or operation of law, or by a deed or conveyance in writing, subscribed by the party creating, granting, assigning, surrendering or declaring the same, or by some person thereunto by him lawfully authorized by writing.

The Association bases it argument on the premise that the September 12, 2010 letter brought about the transfer of a property interest (Plaintiffs' brief on appeal, p 30-31). The trial court did not find this to be so, stating in its summary disposition opinion and order, "The Association's argument that an illegal conveyance of the common area occurred is a mischaracterization and conclusory. The common area at issue is still common area, albeit modified for Defendants' use." As indicated above, that there is no evidence that the Sassons asked for, or the Association or co-owners agreed to, a transfer of interests in the common

element supports the trial court's ruling.  Therefore, if no estate or interest in land has been "created, granted, assigned, surrendered or declared," the statute of frauds is inapplicable.[18]

Finally, the Association attempts to capitalize on the trial court's statement in its summary disposition opinion that "the majority of the co-owners in the condominium unit gave their express permission, or, at a minimum, *acquiesced* in the others' decisions[,]" by arguing that the trial court erred in its application of the doctrine of acquiescence. The Association erroneously infers a legal meaning for "acquiescence" where, when read in the context of the trial court's opinion, it is clear that the court intended its more general meaning of "to accept, comply, or submit tacitly or passively."  See *Merriam-Webster's Collegiate Dictionary* (2003), p 11.  The doctrine of acquiescence is inapplicable in this case, and appellants' attempts to challenge a finding of acquiescence are unnecessary.

### III.  CONCLUSION

For the reasons explained above, we affirm the trial court's grant of a directed verdict to defendants on the question of whether defendants obtained the required approval or consent to modify Unit 5 of the 180 Pierce Street condominium building to occupy and use a portion of the common elements adjacent to the unit.  We also affirm the trial court's grant of summary disposition to defendants.  Given our disposition of this matter, we need not address the Association's claims of relief, nor defendants' alternative reasons for affirming the trial court's orders.

Affirmed.


/s/ Jane M. Beckering
/s/ Jane E. Markey
/s/ Michael J. Riordan

---

[18] Defendants' statement in their brief to this Court that the trial court "rejected the Association's statute of frauds argument," while plausible, gives the impression that the trial court considered it and then rejected it.  In fact, the trial court's ruling made it irrelevant.